Good afternoon. I'm Emily Hartman with the State Appellate Defender for Gerald Nelson. Assistant State's Attorney Marcy Jacobs for the people of the State of Illinois. Ms. Jacobs, good afternoon. First of all, I want to thank you for your supplemental briefs. We've asked a lot of you in this case. This is obviously a very difficult case. I think we're very well done. We are going to do 15 and 15 like we normally do. But as we also normally do, we are pretty flexible. This is our only case. We'll probably give you a little bit more than that if we need to. Ms. Hartman, I assume you're going to want to reserve a few minutes for rebuttal. Yes, that's correct. We'll make sure you get all the time you need. Okay. That microphone is not for amplification. It's just for recording, so please keep your voices up. And other than that, I think we're ready to proceed, Ms. Hartman. Okay. Good afternoon. Good afternoon. May it please the Court? Counsel. I plan to focus on the issue that this Court ordered supplemental briefing on and the related issue dealing with the supervening cause of death and the judge's knowledge of the law relating to that. But if Your Honors have any questions related to the other issues, I'm happy to answer those as well. The state has to prove that Jarrell's death was caused by Nelson's axe and not caused by an unconnected act. The state's position is that any link in the causal chain is sufficient to prove causation. We're not contesting the causal chain. The issue is whether an unforeseeable intervening event occurred, and gross negligence is not foreseeable. It doesn't have to be medical caregivers only. The cases that state negligence on the part of medical personnel or that refer to medical negligence were all cases where there was an allegation of medical negligence on the part of medical personnel. The law is that the death is foreseeable absent an intervening cause. To define an intervening cause based on the profession of the person involved would elevate substance over form by eliminating any other kind of gross negligence from being the supervening cause of death. So what was the supervening cause here? The supervening cause of death. Michelle's failure to use arm braces, which she knew Jarrell had to wear to keep him from rolling over. Her use of a pillow to catch him if he rolled over. She knew that it was risky with Scoot. And her failure to check on him for 16 hours. How do we know for sure that the braces were not on? She didn't really deny that, did she? So the braces were not on because his arms were – the braces kept his arms straight. And his arms – the medical examiner testified that his arms were like this. And that was the way they were when he died. They were frozen in place. Did she say, though, that she did put those on? She said that she put them on. She also said she gave him the – Muscle relaxer. Right, but there was no evidence whatsoever of that in his blood. And I don't – so 16 hours, she gave it to him, and maybe it was out of his blood by then. It wasn't flushed out or any questions weren't really asked about it. And I don't know if it was prescribed or not. But – What do we know about the position of the young boy's body when it was found? Well, it was found on the pillow next – there was a large, like a body pillow next to the bed. Right. And he was found on the pillow. There was a mark. His face was on the pillow. Where was the rest of his body? Well, his leg braces were on. So the best – you know, for the record, it appears as if his legs were still and twisted over, although that isn't clear. Were his legs braced? His legs were braced. So those photos show the legs with braces on and not the arm braces. Does it show the position of the body then? The photos have the – the photos were taken by the officer who responded. Yeah. So she took photos of him as she came to the scene, which was, you know, shortly after. So wasn't he partly on the bed, really? And – but rolled over onto the pillow next to the bed. So partly on the bed, but suffocatingly on the shoes. The mother moved him when she found him, right? I'm sorry? That's correct. I think she grabbed him. Because the police did not find the boy in the position he died in, right? Well, because the mother, I think, grabbed him and was crying. Right. Probably moved him. That's correct. So, yeah, so we only have the photos from the responding officers. Which don't really reflect how he was actually at the time of death. No, we have to connect the testimony about the pillow with the stain so that his face was on the pillow. So we do know that. As far as how far he was out of bed or if he was still on the bed. So let me – I just want to be clear. So mom moved him when she discovered him. Then she pressed him back on the bed? She didn't move him off the bed. If I recall, she may have grabbed him to hug him. I don't think she moved him off. She didn't actually physically move him. There was no evidence of that, no. Okay. No. But she knew that the arm braces were necessary to keep him from rolling over. And she didn't use them. She didn't install bed rails. She used a pillow instead, knowing he was on the bed. Was that an evidence that the purpose of the arm braces? Not the leg braces. She said she knew that. But the arm braces were to prevent a rollover or moving? I believe that she testified specifically that it may – I can't remember exactly. It may have been more generally, though, that the braces were to keep him from moving. But I thought that the arm braces were to keep him from putting his hands in his mouth and to stop him from rolling over. I thought it was just the hands in the mouth. I can't – I think it was – part of her testimony was both. The medical testimony was that this child had no capability of rolling over. Isn't that what it was? No, it was that he didn't have voluntary control. So he wasn't unable to move at all. He couldn't control his movements. So he had spastic movements. So he could actually – he had to be put in braces to prevent his own, you know, involuntary movements from rolling him over. Well, who said he could scoot, a doctor or the mother? The mother said she used the pillow in case he scooted out of bed so it would catch – it would, like, break his fall or break, you know. So did the doctor say that he could move? The doctor said he could roll over. He could roll over. Yes. She knew that the braces were there to keep him rolling over. Do you know which doctor said that? She said doctors. I don't know exactly. I'm sorry. Who said doctors? Michelle said the doctor said she was – she had to use the braces to keep him from rolling over. I don't – the actual doctor? I thought that Michelle said he could not roll over. Michelle said the braces were to keep him from rolling over. Well, moving perhaps, maybe the scooting. But it's not a small difference, I don't think. No, I will check my notes. Michelle said he could not roll over. He was not capable of rolling over. With the braces on. If he had the braces on, so he couldn't roll over. He had to put the braces on so that he couldn't roll over. If I recall, that's her testimony. Okay. I'll check. It was not the most enlightening of testimony, I must say. No. It was probably difficult to question a mother about the death of her son. Maybe people were being ginger with her, but there was some lack of specificity. I took her as saying he could not – he was not capable of rolling over. When you say a doctor said he could, I'm curious, which do you mean that she said a doctor said or a doctor testified in court? She put the leg braces on him at the doctor's request. The braces kept his legs tight together, restricted their movement. These are my notes, not verbatim. Okay. Okay, well, we can look at that. She did say at one point he did not have the ability to roll over because she said he had the braces on. Okay. But we know from the other evidence he didn't have the arm braces on. So is the body pillow that was adjacent to Mary Flush, is there something in the record that says that's always there? That was there in case he rolled over? She put it there, yeah, to keep him – In case he rolled over. Yeah, in case he scooted out of bed. That was her words, but yeah. In case he scooted out of bed. But basically moved over and got out of bed. So the pillow, I think it was described as not quite four feet long, but still a very long pillow that she placed there. Well, it's really kind of important whether he could roll over or not, don't you think? I think that the medical instruments, the braces, were to keep him from rolling over, and she didn't have one set of them on there. And he obviously could roll over because he did. Because if he could roll over without the braces. That's in the record, his involuntary movements, that there was a risk of him rolling over without the braces, that that's why they had to use them. So they never asked the question whether he was capable of rolling over without the braces? I think you're right. It does say that the question was asked with the leg braces and arm braces on, did he have the ability to roll over, and the answer was no. Right. But there was, I think it was 4Ws, 115 maybe. So if he had the braces on. Yes. He had one set, not both. No, but if he had the arm braces on, and he ended up in this position, then there would be a suggestion that. It wasn't negligent because she was obeying doctor's orders. Well, it would be a different question because of the pillow. But, you know, if she was obeying doctor's orders, as opposed to not obeying them. So having those off is what you argue is a super beanie. Having them off, using the pillow, knowing, you know, to catch him if he rolled over, and then not checking on him for such a long time, correct. That those factors were actually what caused his death. Correct. Those were the factors that caused his death. That's the act of gross negligence that interrupted the causal chain. So Nelson is not liable for his death. Is there anything in the record that gives us a sense of her normal conduct during the course of any night? How often would she frequently check on him? She never said if. Is there anything in the record that would suggest that she should have checked on him throughout the course of the night as opposed to when she did? Well, there is nothing to say how often she normally checked on him, if 16 hours was normal or if there was a particular reason that it was okay not to check on a disabled black girl for 16 hours. It's just not in there. Was she asked specifically about the arm braces? Did she say she put him to bed with the brace, the arm, whatever? In her testimony, it says that she put him to bed with both on. She did say they were both on. It's just rebutted by the way he was found and the medical testimony from the state's medical expert, Dr. Denton, I believe, about the positioning of the arms, meaning the braces were not on, and then the way that the braces kept him straight. And she didn't suggest she took the braces off when she was... No, no. She said she screamed and cried. And didn't the doctor also say that the way the arms were, it couldn't have been anything other than that he didn't really have them on that night? Right. That was part of the... Just because of the way they were that he had to have died with them in that position. So the way they were positioned, he had to die with them in that position and the braces... He couldn't have had the braces on because the braces kept him straight and he died with them bent. So... And she didn't say anything about taking them off after she found them And when the officer arrived, they were not on, but the light braces were. So the state doesn't challenge in its brief the notion that the arm braces were not on, given the evidence from Dr. Denton and the photos. The state's argument is that Nelson is liable because he set in motion a chain of events and that that is enough to uphold the finding of causation. But that position would allow culpability to extend beyond the direct results of a defendant's actions into unforeseeable results. What if Jarrell had died in a fire that was caused by a gross negligence? Someone's negligence after falling asleep in a bed with a cigarette. And if it's any link in the causal chain, because he was disabled, he couldn't get out of the fire, under that reasoning, Nelson would be liable for anything. What distinguishes this case from other cases is that this event was unconnected with Nelson's acts, the specific positioning, the sleeping environment. Assuming for the sake of this argument that Nelson's acts made Jarrell unable to extricate himself, this was so five years later, his condition had stabilized, he was no longer on seizure medication, there were consistent medical requirements for his care, including using braces when he slept to prevent him from rolling over. Death due to a failure to comply with known safety requirements is disconnected from Nelson shaking Jarrell five years before. Does gross negligence have to be present? Gross negligence is an intervening cause of death. Pardon me? Gross negligence is unforeseeable. Does it have to be gross? The standard is gross negligence. It's not, there's not an easy definition for what makes it gross versus regular negligence, but the test is foreseeability. So it's something that's not foreseeable and, you know, that a caretaker would, you know, knowing the risk here, knowing that he can't move and he could roll over, I mean, he can't voluntarily move, but he can roll over, he needs those braces, knowing, you know, if he's going to roll over, a soft object, this is common sense, you don't put, you know, babies that don't have the ability to move over with pillows in the crib, knowing, you know, that he couldn't extricate himself. If he did roll over, she put a pillow there, and then not checking on him for so long. These are all unforeseeable events. So from, you know, unforeseeable from Nelson's act. Is there anything you want to say about the judge's comments? Yes, of course. Well, if this Court does find the evidence sufficient, it should still remain for a new trial because the Court's own words show that it misapprehended the law. It's a – after the Court read its verdict, defense counsel asked the Court for a ruling on causation. The Court replied, there's a finding of first-degree murder, finding of guilty on first-degree murder, both counts, that's the Court's ruling in this case. And then in the motion for a new trial, counsel pointed out that the Court hadn't given a ruling on causation. The Court said, with regard to the argument of a supervening cause of death, I don't know if that refers to what happened later in life in terms of how he was positioned in the bed or whatever. I believe it was put in that state by the defendant's actions. This rebutted the presumption that the judge knew the law. In his own words, he said, I don't know. His comments show that he did not know an intervening event, gross negligence standard. He referred to Michelle's actions, but he didn't address the –  He referred to the fact that the defense counsel had not yet determined whether they were an intervening act. And does this Court – does any questions on any of the other issues, or – We'll give you some time. Otherwise, I'll reserve the rest of my time. Ms. Jacobs. Good afternoon. So I first want to clarify the facts that are actually at issue here, and then I want to clarify some of the holdings in some of the out-of-state cases that were cited in defendant's supplemental brief. I didn't get a chance to respond to those. And those are – some of those, I do want to say, are a little bit misleading, what was stated in the briefs about what those holdings were. Now, the very premise of defendant's argument is, one, that the purpose of the braces was to prevent Jarrell from rolling over at night. And, two, that the doctor warned Jarrell's mom of this risk. Neither of those things is true. To be clear, the purpose of Jarrell's braces, which he wore at night and sometimes during the day, were entirely therapeutic to improve the mobility of his muscles. He had severe muscle spasticity, which means his muscles were continually contracted. He had very limited use and control of his arms and his legs. Now, his mom didn't know the terminology. She testified that she was told the braces were to straighten out Jarrell's arms, to keep his arms straight away from his mouth. Now, Dr. Seesong, he's from the Rehab Institute. He would have been the doctor that would have prescribed those braces. In his stipulated testimony, he didn't mention the braces. He didn't mention the purpose. But Dr. Denton, the medical examiner, did explain, in discussing the purpose of the leg braces, that they were to prevent flexure contractures and to preserve the ability of Jarrell to walk in the future. Now, so the only evidence, the medical examiner, Dr. Denton, that was on the record on YYYY35.  was to improve Jarrell's mobility and flexibility. Nowhere in the record is there evidence of what the defendant states in his supplemental brief. Quote, doctors had instructed Michelle that Jarrell was at risk for rolling over during the night, and to prevent this, doctors told her to use braces on Jarrell's arms and legs. That is simply not in the record. So was this boy able to roll over? The only thing that mom, the only thing that mom was ever asked about, rolling over, is in response to defense attorney asking her, did he roll over when he had the braces on? She said, I never saw him roll over. That is the only reference to rolling over in the record. Now, for other, the defendant made that statement without citation to the record. For other similar statements in defendant's brief, she cited two passages, and one of them was simply where mom merely testified that Jarrell had to sleep in his braces, and the other one was the one we just talked about, that she had never seen him roll over when he had braces on. Is there anything else in the record that answers that question? No. So we don't know if the boy could roll over or not? No. We don't know if the boy could roll over or not. That is true. But this is a far cry from saying that the purpose of the braces were so that he would not roll over, and that mom knew this. Okay. And that mom knew there was a risk of rolling over and suffocating. And it's very important what mom knew and didn't know. Why was that body pillow? I'm just curious about that body pillow and what mom knew about rolling over. Okay. Usually there is that so that he won't. Wasn't there some testimony that that body pillow was there just in case he either scooted or rolled? She used the word scoot. And let's recall that the bed, the toddler bed, was a brand-new toddler bed. She had just put it out. It lays on the floor. It wasn't a raised bed. It was on the floor. And she put that pillow out, and the word she used was in case he scooted. Well, if he was like a, you know, I mean, from all accounts, it seems like he was more like a baby than anything else. And so, you know, having a pillow like that in a crib is like asking for a suffocation almost, isn't it? Well, I don't agree with that, and I'll get to why. All right. Okay. So let me get to this. What mom actually knew, okay, what she knew, and she did not know that there was a risk. There's no evidence on the record she knew there was a risk of suffocation. But when we evaluate her actions, the issue isn't whether there was a contributing intervening cause. There was. The issue is whether that intervening cause qualifies as a superseding cause, which relieves defendant of culpability. And the definition of superseding cause is a new cause that operates independently of anything else. Now, defendant agrees that improper or unskilled care is not considered an intervening cause that qualifies as a superseding cause because it is considered foreseeable in Illinois. So the issue about whether mom's actions amounted to merely improper or unskilled care, whether they're ordinary negligence or whether they rose to the level of gross negligence, that's what we're looking at here. So. It's really just a question of whether it rises to the level of foreseeable, right? It's not really. No, foreseeable is not. Actually, the. Okay. So the definition, if you're going to look at the, like, IPIs, like, so regular negligence, what we're looking at is a failure to be aware of a risk as opposed to the next level, which is reckless state of mind, which is a gross deviation from the standard of care, wantonly, consciously disregards that risk. I'm sorry to interrupt you. I think Justice McCrrye was getting at this, too. Who really cares if you put labels on it like negligent or gross? It's really just whether you could see it coming or not, whether it was a foreseeable outcome, right? I mean, you could have an act of God intervene. I don't. There would be no negligence there by any party. I mean, it's a, you know, but you would still say a cutoff liability. You don't. Why are we worrying so much about the level of negligence? The level of her knowledge is extremely important because when we're talking about duty of care, we're talking about she either knew or she didn't know, and I don't believe there was any reason that she certainly wasn't told by a doctor that the braces meant he couldn't roll over, and she certainly wasn't told by a doctor about anything about suffocating. I think I'm trying to get away from the braces for a second. Okay. And just say if this boy was incapable of rolling over, then it is an absolute mystery how he got where he was. If he is capable of rolling over, there was a pillow behind his head, right? That was not. I thought that was in the record that there was a pillow behind his head. Maybe not. And then there's a big body pillow on the side. Well, the description of his body. And he only had to roll over more than once, right? The description of his body was actually that his face was in the pillow and his legs were still, like, up toward the back. Don't forget, this was not a high back. It was a low back. So it might not have been. It might have just been a scoot. It might not have been a full rollover. Well, isn't that part of the kind of question here that the doctor, the pathologist, Dr. Denton, I mean, and the mother, I mean, there is no testimony really how he got to where he was. Well, that's true. I mean, it's circumstantial evidence would show he scooted and he got to where he was. Well, what is that based on? Her saying he could scoot? Common sense. I mean, she didn't, there's no evidence that some other force came in and moved his body. Right, but even the doctor conceded that he really couldn't say how this young child ended up in the position he was. Okay. But what we're looking at is what mom knew and what her acts were. And by all accounts, this mom was a loving, devoted caretaker of this severely disabled child. That medical examiner that she was left alone to take care of for all of those years by the other parents, and the medical examiner found out a mark on his body, no bed sores. The diaper was clean, no neglect, perfectly clothed. She was using the leg braces correctly. She worked over the years with the doctors for his, with the rehab experts and the doctors for his medical care. She was a loving, devoted mom. So my point is that if she did fail to put on those braces that one single night, that that was a mistake or an improper care, and it did not rise to the level of something that the Illinois courts would say is foreseeable. That from the perspective of, from the perspective of, of something that could happen to him in, could happen to the victim throughout his life. Now, there is an analogous case in this. This attorney argued that not having the arm foam on and leaving him for 16 hours without checking and having this pillow, which was an instrument of suffocation, okay, he argued all those things, okay. And basically he was arguing that there was a supervening cause. The defense attorney My only question is this. Should the trial judge have addressed that? Well, first of all, the defense attorney did not argue anything about the braces. He simply argued the 16 hours and the lack of putting a guardrail up. But I'll get to all that. The judge did make a ruling on that. He did say, he found that the causation in this case, he, when he, in his initial ruling, he ruled on causation. He said that he simply accepted the medical examiner's cause of death. The medical examiner said this was a series, positional asphyxiation due to cerebral injury, and the trial court showed that it understood what he meant when the trial court then said, Gerald couldn't extract his face off the pillow. He was buried in it because of the limited physical capabilities at the time. He didn't have the strength to do it. He suffocated on the pillow because of his developmental delays and his physical incapacity because of his cerebral injury. But that's just contributing cause. I mean, the defense acknowledged, I think, and I don't see how they could deny that if he hadn't been paralyzed, he could have expertise. And the defense also acknowledged that it was an accidental suffocation. That is the word that the defense attorney used. Let me get back to it. There is a case in Illinois. It's called people. Okay. So maybe they did, but that doesn't mean there's not a supervening cause. Well, if it's accidental, a supervening cause, a superseding cause, by definition, is one that relieves the defendant. Right. Because it's unconnected. It's an intervening cause. It's so outside the ordinary course of events and the foreseeable course of events that we relieve the defendant of liability. No, it's gross negligent. It means it's grossly negligent. No. No. No. Well, that's one example of it. But the courts in Illinois have never admitted that to gross negligence. That's your position? That that's the only way this could happen? I mean, what if a lightning bolt struck him, came through a window and struck him? I mean, there's no negligence there, but we would still say there was some supervening cause. Well, you know, there was – I mean, surely you don't have to have gross negligence. The Illinois Supreme Court had a case, people versus Amagon, where five years later a person who was paralyzed by, I think it was a gunshot, five years later developed pneumonia. And they still said that the time element does not preclude a causal link. So the fact is that he – this was positional asphyxiation because he couldn't move because of defendant's acts. And he couldn't do what a normal five-year-old could do. Well, isn't that part of the problem, though, that he can't move and, yes, he did move? I mean, wasn't the medical testimony that he really can't move and, yes, somehow he ended up half on the pillow and his legs are still – Well, he couldn't purposely move. He couldn't intentionally move. Most of his movements were involuntary. So wasn't that one of the reasons for these arm braces in the evening? No. Nothing about that. No. It was to help him with his flexibility so that he wouldn't eventually throughout his life lose all ability to move his arms. And, you know, they were doing – he was in therapy for years to get that flexibility, get some use of his arms. And by the time he was five, he was able to, I think, they said, grab a toy, you know, a toy that was in his hand. So that's what the purpose of the braces were. They had nothing to do with rolling over and preventing some kind of danger. The mom absolutely knew none of that. And the knowledge is very important. Now, the case of People v. Sullivan in Illinois is a little bit analogous where you have an 86-year-old victim. The son battered him. He ended up in a nursing home. And two months – and he was bedridden and he was not able to – he was like in a semi-coma state. And two months into his stay at the nursing home, a nurse was bathing him. The nurse leaned back to grab something and the victim fell forward. And two months after that, he died of pneumonia but related to the head injuries. And the court said that the fall was not unconnected to any active defendants because defendants' attack caused the injuries that placed the victim in the situation in the nursing home weakened him to the point of immobility which contributed to the fall. The defendants' acts set in motion a chain of events which led to the victim's death. And here, of course, Durrell wouldn't have needed the arm braces in the first place if it weren't for defendants' acts. He would not – Well, isn't your position really that the evidence in your opinion shows that the death was not caused by intervening events unrelated to the defendants' acts? Isn't that what your position is? My position is the death – there can be two concurrent causes. And this was one. There was an intervening cause, but the intervening cause was not a legally supervening cause, superceding cause. So they were both causes, but that doesn't relieve defendant of his culpability for putting Durrell in the position where he could extricate himself. Who had the burden of proof on supervening cause? The people. I mean, we have the burden of proof that there was no supervening cause. And that's why I want to get back and say that the defense attorney never argued about the arm braces. He only argued about – The only reason I ask you that question is because there was some indication in the briefs that you were taking the position. Well, there's a presumption. Well, okay. There's a presumption. I mean, we always have the ultimate burden. But there is a presumption that the defendant, if he had the attributing cause, which we all agree there was, that now it is a presumption and the burden switches to the defendant to show that it wasn't – that it was a supervening cause. So that part of it – I mean, we also have the burden of proof and causation. I'm sorry. I misanswered your question. But, yes, they have – once we establish that presumption, which we, of course, did. Doesn't cause and fact and proximate cause, aren't those two parts of the element of causation in every case? Sure. Okay. And you have the burden of proof showing causation in every case. Ultimately, yes. That's what I'm saying. So supervening cause is another way of saying you didn't prove proximate cause, right? No. Of course it is. Of course it is. Well, again, it breaks the chain. That it's unconnected. How can the State be relieved of that obligation to prove the absence of a supervening cause? I mean, most of the time there is no question, right? Most of the time someone shoots somebody and no one's arguing the supervening cause. And so there is a presumption that if you're the contributing cause, you're also the proximate cause. But when it's raised, it doesn't seem to happen. I don't think I've ever had a case where it was raised until now. But when it is raised in those rare events, the State still has the obligation to disprove that, right? We always have the obligation of proving causation. Well, then why are you talking about a presumption that the defense has to rebut? Well, the cases do point to a presumption. There is – the case law does say that there is that presumption. But regardless – Are you talking about people versus Mars? That's one of them. Is there another one? I think there was more than one that talked about the presumption. But regardless – Well, that's – regardless, that's a pretty important point, though. I mean, whose burden of proof is it? Well, the bottom line is, is what we're looking at here is whether this is ordinary negligence or gross negligence. So whether we're proving it, they're just proving it, the bottom line here is our argument is this did not rise to the level of gross negligence. And you think that the trial court in the post-trial ruling, you think the court accurately stated the law in those two sentences that he gave on supervening causation? Yes. When he said that he didn't know if defense counsel was referring to it, he wasn't saying, I don't understand the law of supervening causes. He was simply saying, I didn't see it in this case, so if that's what you're referring to, I don't buy it. I think that his – and what he said was, what happens to Durell later in life in terms of how he's positioned or better, whatever, I believe he was put in that position by defendant's actions. So he basically was saying – Well, what about this idea that the mother put this pillow next to the bed, which was like an instrumentality of suffocation? I mean, if he rolled over or scooted into the pillow, he's going to suffocate because he can't do anything. I mean, isn't that a reasonable inference, that there's this enormous pillow next to the bed, and it's like it's one of these foam kind of things where once you're in it, you're in it? And so it's like, isn't there an inference there that this was gross negligence to have a pillow next to the bed where this child can't do anything really to extricate himself? I think that the mother – maybe some people might be aware of that risk, but I don't think this mother was aware of that risk. But that's not really – we don't look at what her subjective thoughts were. We do. No, I think we look at whether or not putting this pillow next to the bed was like asking for suffocation if he scooted. Well, let me – And the bed came with these rails so that he wouldn't move out. She didn't do that. She just thought, oh, I'll do a big pillow instead. If this were a baby in a crib and you stuck one of these enormous pillows in the crib, there's a real chance there of suffocation because babies don't have that same ability to move. Well, let me – So I'm just saying, is there a suggestion that that has to be disproved? So to answer your question, let me point to you to one of the cases in which – one of the out-of-state cases that defendant cited where ordinary negligence for civil liability, which is different than what's going on here. But this was a case where an elderly patient who also couldn't move died of positional asphyxia because she got her – she couldn't control her movement, and she split between the guardrails and the mattress. And her nose got smashed up against the mattress. She couldn't breathe, and she died. So my point is guardrails, pillow, whatever it is, it just goes to show you that what the defendant did – when he did what he did to Jarrell, you can't – he placed Jarrell in risk of so many everyday situations that he – So you're saying the record suggests that you established that there was no intervening cause that contributed or actually that was unrelated to his death? I believe that the intervening cause was absolutely related. He wouldn't be able to not extricate himself if it wasn't for defendant's acts. I mean, and that's why it says the doctors and family don't owe a duty to defendant to treat the victim as to mitigate the defendant's criminal liability. They can't foresee everybody. Nobody could have foreseen all the situations this kid could get in. It could – he didn't put up the guardrails. If he put up the guardrails, he might have – you know, the same thing could have happened to him that that patient did in that nursing home. He – you just can't prevent anything. But if you're going to do what you did to this kid and put him in a position where he can't move and he can't do this, you can't expect this mother to foresee every single possibility to prevent everything. She was doing the best she could. She thought if she put a pillow there, it's like a few inches off the ground. The thing that is puzzling to me is you keep taking everything from the perspective of the mother. I mean, first of all, nobody's beating up on the mother here. I mean, she had a very difficult life caring for this – I'm sure it broke her heart every day to see her little boy like this, and I can't imagine – I mean, I'm a parent. I have to care that much for a kid? Nobody's attacking the mother here. But, you know, what if the mother was not to blame at all? What if the mother had a stroke and just dropped in her house and left that child unattended for 72 hours, no fault of her own, and that child died from starvation or something or dehydration or something? Would we say there was no intervening, supervening cause here because the mother didn't do anything wrong? I don't think we would say that. I think we would say, boy, that's a pretty crazy, unforeseeable thing that happened, tragic. But we wouldn't say, well, it's not the mom's fault. She's a good person. It wouldn't have anything to do with whether she's a good person. You keep coming back to that like that's something that should matter to us. I think we're struggling to understand why it would. It is important what the mother – if she did commit gross negligence. It is important. That is the standard. It has to be gross negligence to break the chain. And I don't believe she committed gross negligence here. And in all of those out-of-state cases, they actually show that in those cases, the mothers or the parents in those cases, they actually did something more. I mean, this mother made a mistake at best. At worst, she made a mistake. At best, it was ordinary negligence. And simply, the law in Illinois is ordinary negligence is not enough. I mean, I just – I do – I just would like to point out some of the – if I go through a couple of those other cases, maybe this can help you, the Court, see what my position is. So in the case of Inree Z.G., this is a California case, that defendants said the parents were convicted of – criminally convicted for causing positional asphyxia of their baby. But that is not what happened at all. This was actually a neglect case where there – it was a custody case where they neglected the baby, and so the custody of the other siblings were taken away, and it was a reinstatement case. And the findings of neglect and – neglect were made in that case, where that mom was under the influence of heavy drugs, been doing drugs for a couple of days, hadn't slept, the dad knew about it, and they still put the baby to co-sleep with the mom, and the baby suffocated. And that court found that there was sufficient evidence that the parents' neglect was a cause of death, with multiple – looked in, was comparing it to a case with multiple concurrent causes. But it didn't distinguish between ordinary and gross negligence. So we're not saying that if you put a baby in a dangerous sleeping position, you can never be – it can never be gross negligence. I'm just saying it wasn't here. It might have been in that Z.G. case. But is the defendant entitled to raise that argument? Well, they – And hold the State to its burden of proving that that wasn't what happened. Of course they can raise it, but – Do you think that the trial judge recognized that? I absolutely think he recognized it, because he said – I mean, his ruling was simply that he didn't believe that it broke the chain. I mean, he – by what he's saying, in his first ruling – He said there was contributing cause. He said there was contributing cause. The medical examiner counsel didn't say anything about supervening cause. The medical examiner wasn't opining on how that child got there or why he should have gotten there or whether somebody should have put a pillow there or not. If all the judge was doing was reciting the medical examiner, that's not supervening cause. And on the post-trial motion, all he basically said is we've got contributory cause. I'm good. Well – That's what it seems like, at least. No. I believe that he understood that it didn't break the chain. I think that's what he was saying when he said – the last line that he said was, I believe he was put in that position by defendant's actions. He didn't, you know, quote verbatim the law, but I believe that that's what he was saying when he said that last statement. I believe he was put in that position by the defendant's actions and it didn't break the chain. And just so you know, like the other cases, these out-of-state cases that kind of seem like, oh, these are close and, yeah, these kind of seem like this was gross negligence. You know, are there other five-year lapses where – did you have any of those kind of cases where – you know, it's one thing if somebody's in a coma. Yeah. If this child had been in a coma from the beginning of the arteries on, I don't think we'd be here. That five-year lapse case was not a coma. That was – No, I'm not saying it wasn't. Oh. If this were a coma and someone died 10 years after a coma, we wouldn't really be discussing this, but that's not what we have here. We have a five-year timeframe, right, between the injuries and then care for five years and then boom. Yes. And Illinois courts say that a mistake in care is foreseeable and, therefore, not a superseding cause. And did Dr. Denton – does anybody really know from this record how that child got where it went that night? Does anybody know? Well, I believe circumstantially – I believe – But what is the circumstantial evidence? I mean, I thought Dr. Denton clearly said, I don't really know how he got there. Didn't he say that? I mean, there's no testimony really of any kind. I don't know that Dr. Denton addressed that. Is that an absence that's important? Well, he's your pathologist. Dr. Denton is your pathologist. And he said it was a series of things. But I thought at the very beginning this series was missing a big thing, like how he got from the bed to where he ended up. On that point, I think it's circumstantial evidence and common sense how he got – I mean, that's just my position on that. What was the medical testimony of these doctors? Was there any, really, any medical testimony by any doctor to explain what his real condition was at this point in his life and that, you know, he was either not able to move or he was able to scoot or he – I mean, she wasn't a doctor, the mother. So is there any real medical testimony about what he was capable of doing in terms of his sleeping habits at night? Dr. Sisong is the – that was the rehab institute doctor. I mean, he's the only one who talked about that he had spasticity, that he had very limited movements. He was able to grasp a toy. But he also interestingly said, I get all of my information about Jarrell's developments from mom, reported from mom. So mom is the one who's taking care of him. So she's the one who says, oh, now he can do this or now he can't do that, you know. So that's the only evidence. Who gets his medical information from the mom? Well, he gets the information on what the boy is able to do from the mom. Yeah. I can't change the record on that. No, I know, and I don't think there's something absent from the pathologist's testimony. I thought he said, I don't really know how he got from point A to point B. I don't believe he – I – recall reading that? I could be wrong. I don't. I could be completely wrong. But nonetheless, it was – again, I think everyone was just going by the circumstantial nature of the situation and the position he was found in. So, again, I want – I do want to get back to the knowledge element, because the knowledge element is the distinction between ordinary negligence and gross negligence. And all of these cases, there was a case, State v. Bolzay-San, that the defendant cited, where a licensed daycare provider put a baby to sleep on an adult bed with a bunch of pillows around it. And this was in violation of the licensing regulations of the daycare provider. And there was evidence on the record that this daycare provider was explicitly warned of the dangers of doing that. So in that case, there was reckless behavior found, so conscious disregard. However, at the same time that the court affirmed that conviction, the court also said a reasonable jury could have also found the acts not reckless in putting the barrier of pillows around the victim. But because it had to view the evidence in the light most favorable to the State, it affirmed the conviction. So there is – it is not a foregone conclusion that this was a horrible thing that mom absolutely – well, she certainly didn't know whether she should have known. She just was doing what she could. And she was caring for this kid the best she could. But she – this was – Counsel, you don't know what she knew or didn't know, do you? I'm sorry? You don't know what she knew or didn't know on that. Well, based on the record – I mean, the testimony is pretty sparse. I mean, are you saying there's something in here where she says I had no idea that a pillow by the side of the bed was a bad idea? No, but there also is literally nothing in the record that says she was told by the doctor that putting a pillow by the bed was a bad idea or not putting the braces on was a bad idea. Okay, but that doesn't tell us what she knew or didn't know. That just means the doctor didn't say something to her. And I'm just extrapolating from her testimony, the loving nature and devoted nature of her taking care of this kid, that she was doing the best she could. And if she did know, it doesn't seem, based on her testimony and based on all the facts we know about her, that she would have intentionally done something like that. So my inference from the record is that she did not know. I don't think anybody is suggesting that she did anything intentionally. You know, I don't think that. I think the issue or the question yet remains is how did this little guy get in the position that he was in? And I don't think that there's anyone who's here today who's told us how he did get there. The record is the record. But, again, how he got there is not the issue. The issue is her. It is her because it is whether she committed gross negligence. That is the issue. What she did, her actions and her knowledge are part of, goes into that calculation. So that actually is the issue, okay, what she did. And, again, these other cases, there's so many differences in them. The State versus Weber, the parents gave their 16-month-old adult sleeping medication for two weeks because the baby wouldn't shut the blanket up, okay, and put them in the bed with lots of blankets and stuffed animals. And that was found to be reckless there. You're distinguishing the cases in the supplemental version. Yeah. I think we can take your point. Okay. But I want to make a point particular about that case because those parents where they were found, gross negligence, the equivalent of reckless behavior, those parents were actually in the same position as defendant in this case where their acts of drugging that baby were what prevented that baby from being able to extricate herself from that positional asphyxia. So these cases do not go to show that what this mother did was, you know, prevented the child from extricating himself. Right. Mother is not on trial here. So these cases, which she's trying to show, shows that the mom had gross negligence in this case, and that is what needs to be found in order to say the chain is broken. These cases do not support that at all. I don't think that Illinois case law supports what you just said either, though, if I have to say. Okay. It does not say it has to be gross negligence. So it has to be some unforeseeable, unreasonable thing that, you know, outside the ordinary course of events. I've never seen anything that says it has to be gross negligence. Well, Illinois case law says. There are examples of that, and, in fact, that's the most common example. The most common example is someone gets grievously wounded, and they go to the hospital, and the doctors treat them, and either they treat them well or they don't, and we get into whether it was gross or ordinary medical negligence. I get you that that's the most common example, but I don't understand how that could be the only example. Well, the other is. Can I give you an example of what if the mother had had a stroke? The mother had had a stroke and dropped to the floor unconscious for 72 hours, and that child died because nobody was taking care of her. Would we charge – would you charge this defendant with murder for that? I would say. I think the answer is no, and I don't think a jury would ever convict them. And the reason they wouldn't is not because the mother did anything wrong. It wouldn't have anything to do with negligence of any kind. It would just be because what happened was so out of the bounds of what could be reasonably expected that we're going to relieve the defendant of liability. And what is wrong about what I just said? Well, I think that Illinois case law, I mean, we have cases where if a – we have – there's one case where a woman decided she didn't want life support and took herself off life support. I mean, these are decisions that are considered foreseeable. So – Okay. Foreseeability is a question of fact, right? Foreseeability is a question of fact. And when we're looking at this in the light most favorable to the State, this judge felt that a mistake of care or an error in care passably was something – Irremediable. Exactly. Okay. Okay. So we do think that this defendant's act was a contributing act that, along with other acts together – I'm not saying her act wasn't a contributing, intervening act. It was. But it was not – it did not rise to the level of a superseding cause. It was not unconnected to what defendant did to make that baby unable to move and extricate himself. And we hope you affirm the conviction. Okay. Thank you, counsel. Your Honor, it's correct that gross negligence is not the test. It is foreseeability. Gross negligence does break the causal chain, but the reason is because it's unforeseeable. In other states, for example, where they have similar laws, they use the phrase act of God as another type of unforeseeable event, such as a lightning strike or fire or anything like – that isn't directly connected to the defendant's actions. It's common sense that putting a pillow in the crib of a baby or a child who is disabled who can't control their movements is unsafe. You don't put a pillow in a crib, extra blankets. You don't put it next to him in order to catch his fall when he rolls over. Any parent would know that. Anybody would know that. So let me ask you about the leg braces because Ms. Jacobs made a pretty impassioned point here that there's nothing in the record that suggests the purpose of the leg braces were to stabilize the child in bed. Where do you get the evidence that that was the reason that they had the leg braces? If only we had e-records for this. I just have my notes. And what I've got is just from pages WWW 114 to 115 is what I've cited for that and what I've got. That's the mother's testimony. It's the cross, I think, and the mother, yes. But I don't have the records. I understand. But besides the mother's testimony, are there any medical? No. I don't think the mother said that. No. I think the mother said she had never seen him roll over with the braces on. You made that point. I think Ms. Jacobs made that point. But I don't think she ever said the purpose of the braces was to prevent roll over. So it's what I have from my notes. But, again, I can't recall exactly what she said. So it was on cross. But I wish I could say for sure. But it's just what I wrote down. This is a nice situation where either Nelson or Michelle is necessarily to blame. Just because Michelle, of course she can't be expected to foresee every outcome. She's not Superwoman. She's just a tired parent. Whether or not the result of this case was, you know, whether or not the state proved causation doesn't mean that Michelle is on the hook or that she isn't there for it. One of them has to be guilty of murder. You know, he did plead guilty to aggravated battery of child. There are crimes for causing this kind of injury. Aggravated battery of child is a very serious crime. And so it doesn't mean anything that she, you know, couldn't be expected to be there for it. But the purpose of the record. Isn't the record sort of at least somewhat establishing the idea that there were a lot of possibilities that he could die at night? So he could have died. Well, at this point. Well, he did, right? He did. Well, at this point, you know, there wasn't he had stopped having seizures or he stopped seizure medication. His condition had stabilized. He didn't, there wasn't anything to suggest he was on a ventilator or otherwise at risk of sudden death from the injuries. But for, you know, take Amagon, the case, the state sites, that was a case where the person had quadriplegia and died of pneumonia. And the Supreme Court specifically said that it was not unforeseeable that someone with decreased lung function would catch pneumonia. There was a direct tie between the pneumonia and the injury there. Again, in Sullivan, Sullivan was a case where the issue with the fall, he got pneumonia because after he was injured. And then there was this fall. But the medical testimony was the fall didn't hurt him that much. He was the same after the fall. And he died of pneumonia. So they had tried to argue the fall was an intervening cause. And they just went to the testimony. The fall didn't hurt him that much. It wasn't really related to his death. Sullivan isn't really on point. And the case with the person going off life support that the court held, choosing to go off life support is natural and foreseeable. Again, going back to the test of foreseeability. Does the record, though, overall show us that the death was not caused by an intervening event unrelated to the Defendant's Acts? Isn't that the standard, unrelated to the Defendant's Acts? This is unrelated to the Defendant's Acts in the sense that the, putting him in the unsafe sleeping environment, the pillow next to the bed, not checking on him, leaving off the braces. He's got cerebral palsy. Well, but think about his condition that everybody's aware of. How can you really say that it's specifically unrelated to the Defendant's Acts? Because his condition is what made him susceptible to, you know, an easy suffocation. Well, if that was the case, so it did make him susceptible. It's still the cause in this case, though. When there is a known medical, you know, you need to make sure he doesn't flip over in the night, don't, you know, put him in an unsafe sleeping environment. When that happens, it's not, that is not connected to the act of shaking him five years earlier. If that was causation, anybody who caused a permanent disability, regardless of any other crimes they might be guilty of, is also guilty of murder any time a caregiver neglects proper care and is grossly negligent. I don't think we're relitigating, you know, his medical condition here. I don't think it's about whether the shaking caused everything. You know, there's... No, but the caregiver's neglect is not foreseeable. It's outside the, it's not connected. The neglect is not connected to the act of the Defendant. So that's the... Don't the cases really say just the opposite? That a caregiver's, you know, care isn't necessarily unrelated? There are the cases which I'm aware of involve medical caregivers, and the only ones that analyzed it all found that the care was perfectly solid, good medical care. Often, I think, exemplary medical care. There wasn't any finding of medical care that was negligent or that was unforeseeable that was actually an intervening event. The purpose of the cases from out of state, regardless of the standard use, the purpose of those cases is to show that a failure to take action in response to a known risk and putting a child in an unsafe sleeping environment, those are acts that are negligent acts. They are not, they lead to a cause of death that's unforeseeable. I believe one had an infant that had a break. So it was in a body, it was in a cast, a broken limb, and couldn't move because of that. And they were, you know, you need to watch out for that. You can't put him in a position where he can't move. The point isn't to match the standards here. It's about foreseeability. And then the last point, unless you have any other questions on that issue, was just the court's dismissive comment, you know, I don't know what that is. It does show that the court didn't know the law, didn't look up the law, and it's not, you know, the court's, it's certainly not a common law. It's rare. It's not something that the judge necessarily would be expected to know off the cuff. You know, this is not an uneasy area of the law to research, as we know. But the comment that the court made shows he didn't look it up and he didn't know it. And Mr. Nelson at least had a right to have the state's burden of proof on causation sustained and have the court make that finding. So if this court does find the evidence sufficient, we request that you do remand for a new trial. For the issues argued today and in our briefs, we ask that you either reverse this conviction or remand for a new trial. Thank you. Okay, thank you very much. Both of you did an excellent job, which did the test, we realize. Great job on your briefs, too. Thank you for everything. It's a very difficult case. We'll take it under advisement and stand adjourned. Thank you.